IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROGER BOWLING,

             Plaintiff,

vs.

Case No. 05-1106-JTM

METROPOLITAN LIFE INSURANCE
COMPANY,

             Defendant.

MEMORANDUM AND ORDER

Plaintiff Roger Bowling has brought the present 29 U.S.C. § 1132(a)(1)(B) action seeking long-term disability benefits pursuant to an employment benefits plan. Bowling's claim for benefits was approved by the administrator of the plan, defendant Metropolitan Life Insurance Company, and benefits were paid for two years. Thereafter, however, Metropolitan denied further benefits on the ground that the claimed disability did not fall within the coverage of the plan. Both parties have moved for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Bowling was employed by Jackson Dairy, a division of The Kroger Co., and was a participant in the company's Health and Welfare Plan, which is funded by a group policy of long term disability insurance issued by MetLife to Kroger.

MetLife is the Claims Administrator for the Plan. As Claims Administrator, MetLife is responsible for processing claims and deciding appeals from denials of claims. The Plan confers discretionary authority on the Plan Administrator and other Plan fiduciaries, stating:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(R. 38).

The Plan explicitly defines "Disability" —

2

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

(R. 14-15).

The Plan provides:

> **Limitation For Disabilities Due to Particular Conditions**
> Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a:
>
> ....
>
> 2. Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:
>
> a. seropositive arthritis;
> b. spinal tumors, malignancy or vascular malformations;
> c. radiculopathies;
> d. myelopathies;
> e. traumatic spinal cord necrosis; or
> f. musculopathies.

(R. 23).

The Plan includes the following definitions:

> Seropositive Arthritis: An inflammatory disease of the joints supported by clinical findings of arthritis plus positive serological tests for connective tissue disease.
> Spinal: Components of the bony spine or spinal cord.
> Tumors: Abnormal growths which may be malignant or benign.
> Vascular Malformations: Abnormal development of blood vessels.
> Radiculopathies: Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology.

3

> Myelopathies: Disease of the spinal cord supported by objective clinical findings of spinal cord pathology.
> Traumatic Spinal Cord Necrosis: Injury or disease of the spinal cord resulting from traumatic injury with resultant paralysis.

(R. 23).

Bowling worked for Jackson Dairy as Ice Cream Superintendent, running a production floor. His last day of work for Jackson Dairy was September 24, 2001. Bowling underwent surgery for decompression of the spine at L3-L4, L4-L5, L5-S1 on September 25, 2001, and underwent a spinal fusion with instrumentation in December 2001.

After his back surgery, Bowling submitted an application for long-term disability benefits. MetLife paid benefits to Bowling for 24 months, from January 6, 2002 through January 5, 2004.

On December 30, 2002, MetLife informed Bowling that benefits would terminate after January 5, 2004, because of the Plan's 24-month limitation on payments for disability due to neuromusculoskeletal disorder. The December 30 letter advised Bowling of his right to appeal the denial of further benefits.

Bowling appealed the termination by letter of February 18, 2004, and enclosed a letter of January 23, 2004 from his treating physician, Dr. Pollock, in which Pollock wrote that Bowling had "significant pain that is only controlled by the use of an indwelling morphine pump" used to relieve plaintiff's right leg pain, "the result of a nerve root injury which gives rise to a radiculopathy of the L4 nerve root." He concluded:

> As a result of his documented and well-known radiculopathy, it seems to me that he would fit the criteria for long-term disability. I urgently ask that you reconsider the opinions that you expressed to Mr. Bowling on December 30, 2003.

(R. 105).

MetLife had plaintiff's medical records reviewed by Gary P. Greenhood, M.D., an Independent Physician Consultant. Dr. Greenhood spoke with Dr. Pollock on April 9, 2004 and summarized their conversation as follows:

> I explained to him that I have been unable to find objective evidence of a radiculopathy on my review of the file — We discussed that there was no mention of a MRI, CT, myelogram, electrodiagnostic study following the surgery of

> December of 2001 and no mention of reflex asymmetry or dermatomal sensory or motor deficits — He agreed and stated that when he saw the patient again, he might consider obtaining some of these studies and detailing the results of a neurological examination.

(R. 91). In answer to a question whether the submitted information provided objective evidence of seropositive arthritis, spinal tumors, malignancy or vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis, or musculopathies, Dr. Greenhood responded:

> There is no suggestion from the submitted information of seropositive arthritis; spinal tumors, malignancy, or vascular malformations; myelopathies; traumatic spinal cord necrosis; or musculopathies.
>
> On 11/25/01, a CT myelogram showed mass effect upon both L5 nerve roots adjacent to the L4-L5 interspace. On 12/11/01, an electrodiagnostic study and a suggestion of diffuse and chronic denervation of L4, L5, and S1. These support the existence of a radiculopathy prior to the surgery on 12/19/01. However, I do not know the basis for Dr. Pollack's statement on 1/23/04 that the patient had a nerve root injury that gave rise to an L4 radiculopathy.
>
> While its report is not submitted, a CT scan of the lumbar spine obtained following the most recent lumbar surgery (12/19/01) allegedly showed some probable scarring at L4-L5 with no nerve root impingement from implanted screws. Following the surgery of December 2001, there are no reports of focal neurological deficits and electrodiagnostic studies. Without electrodiagnostic evidence of a radiculopathy, imaging-study evidence of nerve root compression, or dermatomal neurological deficits, I am not able to concur with the existence of a radiculopathy subsequent to the surgery of 12/19/01.

(R. 92).

MetLife upheld the denial of further benefits and so advised plaintiff by letter of April 19, 2004. The letter recited the Plan's limitation, noted Dr. Pollock's January 23, 2004 letter and the Independent Physician Consultant review, and stated:

> On 4/1/2004, the Independent Physician Consultant stated that there was no suggestion from the submitted information of seropositive arthritis; spinal tumors, malignancy, or vascular malformations; myelopathies; traumatic spinal necrosis; or musculopathies. On 11/15/2001, a CT myelogram showed mass effect upon both L5 nerve roots adjacent to the L4-l5 interspace.
>
> On 12/11/01, an electrodiagnostic study and a suggestion of diffuse and chronic denervation of L4, L5 and S1. The medical information did not support the existence of a radiculopathy prior to the surgery on 12/19/01.
>
> While the report is not submitted, a CT scan of the lumbar spine obtained following the most recent lumbar surgery (12/19/01) allegedly showed some probable scarring at L4-L5 with no nerve root impingement from implanted screws. Following the

surgery of December 2001, there were no reports of focal neurological deficits and electrodiagnostic studies. In review of the file it was noted that without electrodiagnostic evidence of a radiculopathy, imaging-study evidence of nerve root compression, or dermatomal neurological deficits, it was difficult to concur with the existence of a radiculopathy subsequent to the surgery of 12/19/2001.

The Independent Physician Consultant was asked to further clarify your medical status with respect to the limited benefit condition with your treating provider, Dr. Pollock.

On 4/9/2004, the Independent Physician Consultant indicated that he spoke with Dr. Pollock via telephone regarding being unable to find objective evidence of a radiculopathy in the medical records. Specifically, that there was no mention of a MRI, CT, myelogram, electrodiagnostic study following the surgery of December of 2001 and no mention of reflex asymmetry or dermatomal sensory or motor deficits. Per the record, Dr. Pollock agreed. According to Case 6:05-cv-01106-JTM Document 33-1 Filed 11/04/2005 Page 2 of 15 3 the record, Dr. Pollock noted that when he saw you again, he might consider obtaining some of these studies and detailing the results of a neurological examination.

Based upon the above medical information, there does not appear to be objective medical evidence to exempt you from the limited benefit condition clause as noted in your Plan. Therefore, the original decision to deny your Long-term Disability was appropriate.

(R. 95-97).

Dr. Pollock submitted a letter dated May 20, 2004, stating in part:

Despite every attempt to relieve his pain, he has continued to suffer significantly. In an attempt to evaluate this, I have ordered several studies. These have included EMGs which reveal significant peripheral neuropathy of the right lower extremity and chronic radicular changes secondary to spinal stenosis. Full testing was not possible because of the patient's very large size and swollen legs. This does not, of course, mean that he does not have significant radiculopathy; I believe he does. His recent CT and myelogram, which was also performed to see if there were some continuing spinal stenosis, reveals some persistent soft tissue scarring in the area at L3-4, particularly on the left side and some increased narrowing at L5-S1, which is probably the result of progressive degenerative changes following his fusion at two levels immediately above this. This, as you probably well know, is not uncommon.

(R. 86).

Additional medical records from Dr. Pollock's office were submitted, and Bowling submitted an additional CT report dated January 30, 2003. Bowling submitted another letter dated June 4, 2004, requesting reconsideration of his claim.

MetLife had the new medical information reviewed by Dr. Greenhood, who supplemented his report by inserting the additional information he had reviewed and his comments on that

6

information in bold type on June 6, 2004. The additional records submitted included a myelogram and CT of the lumbar myelogram dated May 19, 2004 and an electromyography (EMG) dated April 29, 2004.

    The May 19, 2004 report of the CT-myelogram stated in part:

> AP, oblique and lateral views demonstrate no spinal stenosis at any level. There is a small anterior extradural defect at L1 and L2, probably due to a small posterior disc bulge. I do not see thickened nerve roots at any level. No amputation of any of the nerve roots is seen. The nerve roots do appear to fill well at each level.
>
> IMPRESSION: Normal lumbar myelogram without evidence for spinal stenosis or nerve root encroachment at any level.
>
> CT OF THE LUMBAR MYELOGRAM: The CT examination demonstrates no spinal stenosis at any level. I do not see any anterior defect upon the thecal sac. There is perhaps borderline spinal stenosis at L2-L3. There is some mild facet joint hypertrophy bilaterally at this level. There is no evidence for disc herniation or mass upon any of the nerve roots at any level. No abnormality is seen.
>
> ....
>
> IMPRESSION:
>
> 1. Borderline spinal stenosis at L2-3, of doubtful significance.
> 2. Postoperative laminectomies and spinal fusion at L3 through L5.
> 3. No nerve root encroachment or herniated disc at any level.

(R. 84).

    The EMG report of April 29, 2004 stated in part:

> IMPRESSION: Severe degree of left carpal tunnel syndrome and moderate degree of right carpal tunnel syndrome. Moderate degree of right ulnar nerve entrapment across the elbow. No evidence of radiculopathy.

(R. 85).

    Dr. Greenhood quoted the April 29, 2004 EMG report and described the results of the May 19, 2004 CT-myelogram as follows:

> 5/19/04 – CT myelogram showed borderline spinal stenosis at L2- L3 of doubtful significance, laminectomies and spinal fusion from L3 through L5 – "no nerve root encroachment or herniated disc at any level."

(R. 79).

    Dr. Greenhood concluded:

7

> The additional information – which is in bold type – does not provide objective evidence of a radiculopathy or myelopathy. I do not know the basis for Dr. Pollack's statement on 5/20/04 that an EMG showed "significant peripheral neuropathy of the right lower extremity and chronic radicular changes secondary to spinal stenosis." Reports from two electrodiagnostic studies are included in the submitted materials. On 12/11/01, an electrodiagnostic study showed a mild peripheral neuropathy and a suggestion of diffuse and chronic denervation of L4, L5 and S1 with no acute Case 6:05-cv-01106-JTM Document 26 Filed 10/14/2005 Page 9 of 19  10 radiculopathy. On 4/29/04, an electrodiagnostic study showed "severe degree of left carpal tunnel syndrome and moderate degree of right carpal tunnel syndrome – moderate degree of right ulnar nerve entrapment across the elbow – no evidence of radiculopathy. Neither study showed evidence of a radiculopathy.
>
> CT – myelograms performed in January of 2003 and May of 2004 did not show objective evidence of nerve root compression or spinal cord compression.
>
> While the patient clearly has significant pain in view of the morphine pump, past surgical procedures, and Dr. Pollack's assessment, the submitted information does not provide objective evidence of seropositive arthritis; spinal tumors, malignancy, or vascular malformations; radiculopathies; myelopathies; traumatic spinal cord necrosis; or musculopathies.

(R. 79-80).

MetLife upheld the denial of benefits and so advised Bowling in a letter of June 7, 2004. The letter stated in part:

> Your entire file was referred for review by an Independent Physician Consultant, board certified in internal medicine and infectious diseases. The additional medical information submitted was included. The findings of the review indicate that while you clearly have significant pain in view of a morphine pump, past surgical procedures, and Dr. Pollack's assessment, the submitted information does not provide objective medical evidence of seropositive arthritis; spinal tumors, malignancy or vascular malformations; radiculopathies; myelopathies; traumatic spinal cord necrosis or musculopathies.
>
> Based upon the above medical information, there does not appear to be objective medical evidence to exempt you from the limited benefit condition clause as noted in your plan. Therefore, the original decision to deny your Long-term Disability was appropriate.

(R. 73).

On November 30, 2002, Bowling was notified that he was awarded Social Security disability benefits of $1,372.00 per month beginning March 2002. The Plan provides for reduction of the Monthly LTD Benefit by certain Other Income Benefits, including benefits under the federal Social Security Act. By letter of January 27, 2003, MetLife advised Bowling that the Social Security award

had created an overpayment and that, unless he paid the overpayment by check or money order, benefits would be withheld to offset the overpayment amount. On July 2, 2004, MetLife wrote Bowling, noting that it had been withholding monthly benefits and applying them to the overpayment, and that the balance due had been reduced to $1,232.40 by the time the claim was terminated on January 5, 2004. The balance of $1,232.40 remains outstanding.

Bowling filed this action in the District of Reno County, Kansas on March 22, 2005. MetLife removed the action to this court on April 18, 2005. 39. MetLife filed its answer and counterclaim on May 23, 2005.

**Conclusions of Law**

When an ERISA plan gives an administrator discretion in granting or denying benefits, the court "must uphold its decision on the issue in question unless the decision was arbitrary and capricious." *Wolberg v. AT&T Broadband Pension Plan*, 123 Fed.Appx. 840, 844 (10th Cir. 2004). The defendant's decision with respect to benefits will be upheld so long as it can point to substantial evidence in support of that decision. *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1005-06 (10th Cir. 2004), *cert. denied*, 125 S.Ct. 1972 (2005). In this context, substantial evidence means "more than a scintilla but less than a preponderance." *Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991). *See Holt v. Continental Cas.*, 379 F.Supp.2d 1157, 1172-1173 (D.Kan. 2005) (denial of claim upheld where there was "more than a scintilla of objective medical evidence to support its decision"). This standard is subject to some modification in the event a plan administrator is subject to a conflict of interest. This has previously summarized the standards with respect to cases involving the review of decisions by a plan administrator with an inherent conflict of interest:

> First, the plan administrator must demonstrate: 1) that its interpretation of the terms of the plan is reasonable; and 2) that its application of those terms to the claimant is supported by substantial evidence. Second, the court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

*Lewis v. ITT Hartford Life & Accid. Ins. Co.*, 395 F.Supp.2d 1053, 1062 (D.Kan. 2005) (*quoting Fought*, 379 F.3d at 1008, internal quotations removed).

The court finds that the administrative record contains substantial evidence to support defendant MetLife's determination.  Here the Plan explicitly provides for benefits longer than 24 months only if there is objective evidence of one of the six conditions explicitly listed in the Plan, here,  as an exception to the 24-month limitation. The only relevant condition applicable here is radiculopathy, and the record contains strong support — in form of CT scans on January 30, 2003 and on April 29 and May 19 of 2004 — for a conclusion that radiculopathy had not been demonstrated.  Bowling's medical records fail to confirm either a documented nerve root injury or a documented radiculopathy.

Dr. Greenhood, finding no objective evidence of radiculopathy, contacted Dr. Pollock about the absence of diagnostic studies after the surgery of December, 2001.  Dr. Pollock agreed to consider detailed examinations later.  However, the letter which was subsequently submitted by Dr. Pollock merely reiterated his subjective conclusion that Bowling had radiculopathy.  His letter noted that full testing was not possible, but that that did not "mean that he does not have significant radiculopathy; I believe he does." (R.86).

In responding to MetLife's motion for summary judgment, the plaintiff lays particular stress on Dr. Greenhood's notation that there was myelographic and electrodiagnostic "evidence of radiculopathy prior to the surgery on 12/19/01," that there was some indicia in the April 29, 2004 EMG of "peripheral neuropathy," and that the September 24, 2001 notes of Dr. Pollock showed evidence of stenosis.  But there is no evidence in the record which would equate a "small anterior extradural defect at L-1 and L-2" with the objective evidence of radiculopathy required by the Plan. Dr. Greenhood reviewed the indicia of stenosis, found that it was "[b]orderline" and "of doubtful significance," and in any event there was "[n]o nerve root encroachment or herniated disc at any level."  Dr. Greenhood also expressly notes that there remained  an absence of radiculopathic evidence of disability *after the surgery*, and that "[f]ollowing the surgery ... there are no reports of

10

focal neurological deficits and electrodiagnostic studies." Dr. Greenhood concluded that there was no post-surgical "electrodiagnostic evidence of a radiculopathy, imaging-study evidence of nerve root compression, or dermatomal neurological deficits." In reaching this conclusion, Dr. Greenhood thus noted not only the absence of radiographic and electro-diagnostic evidence, he also found that there was an absence of clinical evidence showing any documented neurological deficits.

This absence of objective evidence is reflected in the specific findings in each of the examinations. The report of the May 19, 2004 examination scan found "[n]ormal lumbar myelogram without evidence for spinal stenosis or nerve root encroachment at any level." The April 29, 2004 examination stated:

> IMPRESSION: Severe degree of left carpal tunnel syndrome and moderate degree of right carpal tunnel syndrome. Moderate degree of right ulnar nerve entrapment across the elbow. *No evidence of radiculopathy.*

(R. 85) (emphasis added). There is substantial evidence in the record to support the decision of the Plan Administrator that there was a lack of objective evidence of radiculopathy, and hence its decision to deny long-term benefits. Accordingly, MetLife did not violate its legal duties in denying additional benefits.

In addition to seeking dismissal of Bowling's claim, MetLife also requests judgment on its counterclaim in the amount of $1,232.40, the amount of alleged overpayment of benefits in light of the retroactive approval of Social Security benefits for a period during which plaintiff was paid an unreduced long-term disability benefit. Bowling's response provides no argument on the issue other than to state that benefits under the Plan should have continued, and thus "the overpayment ... should be allowed as a credit" against the continuing long-term benefits which Bowling argues should have been granted. (Dkt. No. 31 at 12). Since there is no disagreement as to the fact and the amount of the overpayment, and because the court finds that MetLife did not violate its responsibilities under ERISA in denying continuing benefits, there is nothing to give a credit against, and hence no basis for denying MetLife's counterclaim.

IT IS ACCORDINGLY ORDERED this 14th day of March, 2006, that the motion for summary judgment of the plaintiff (Dkt. No. 29) is denied, that of the defendant (Dkt. No. 26) is granted, and judgment will be entered in favor of defendant on its counterclaim in the amount of $1,232.40.

>                            s/ J. Thomas Marten
>                            J. THOMAS MARTEN, JUDGE